## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 13 2017, 5:28 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT - FATHER

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLANT - MOTHER

Frederick A. Turner
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of J.J. (Minor Child); | November 13, 2017 |
| D.J. (Father) and P.J. (Mother), | Court of Appeals Case No. 60A04-1704-JT-759 |
| *Appellants-Defendants,* | Appeal from the Owen Circuit Court |
| v. | The Honorable Kelsey B. Hanlon, Judge |
| Indiana Department of Child Services, | Trial Court Cause No. 60C02-1604-JT-134 |
| *Appellee-Plaintiff.* | |

**Najam, Judge.**

## Statement of the Case

D.J. ("Father") and P.J. ("Mother") (collectively "Parents") appeal the trial court's termination of their parental rights over their minor child J.J. ("Child"). Parents present a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of their parental rights. We affirm.

## Facts and Procedural History

Father and Mother are married and have four children together, J.M.J. (born in 1995), D.D.J. (born in 1997), D.N.J. (born in 1998), and Child (born April 10, 2004). On November 20, 2014, someone contacted the Indiana Department of Child Services ("DCS") to report that Father had physically abused D.N.J. after Father had consumed alcohol. Thereafter, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). After Mother and Father failed to fully comply with services and after they demonstrated that they were unable to care for Child, DCS filed a petition to terminate their parental rights over Child.

Following a hearing, the trial court granted the petition on April 5, 2017. In support of its order, the trial court entered the following findings and conclusions:

b. There is a reasonable probability that the conditions that resulted in the Child's removal or the reasons for placement outside the parent's home will not be remedied, to wit:

i. The Parents have struggled for an extended period of time to meet the needs of the Child. [J.J.] has been under the supervision of a Juvenile Court for a substantial portion of the five (5) years preceding Trial.

ii. [J.J.] is medically fragile. [J.J.] suffers from spina bifida, epilepsy, and sleep apnea as well as several other related conditions. [J.J.] has a shunt in his brain. [J.J.] uses a wheel chair, requires regular catheterization, and cannot receive liquids orally. [J.J.] has [a] g-tube through which he receives liquids and medications. If [J.J.] ingests liquids or non-solid foods by mouth, he is likely to aspirate. This type of aspiration jeopardizes [J.J.]'s lung function. The Child's lung function is further jeopardized by the Child's abnormal spinal curvature.

iii. The Child's spinal curvature will require surgery to prevent further lung function impairment.

iv. The Child has been treated by a number of physicians. Dr. Aline Hamati, a physician at Riley Hospital for Children, provides care for [J.J.]'s neurological issues. In addition to seeing Dr. Hamati, the Child needs to see his subspecialists on a regular basis.

v. [J.J.] has the most severe type of spina bifida and has a myelomeningocele located on his L-1 vertebrae. Dr. Hamati should see [J.J.] every six months. In spite of this need for regular medical supervision, [J.J.] was not seen by Dr. Hamati during the following periods: from November of 2009 to February of 2011, from April 2011 to June of 2012, and from December 2012 to March of 2015. It should be noted that during some of the relevant time frames during which [J.J.]'s treatment with Dr. Hamati lapsed, a Juvenile Court would have been

exercising jurisdiction over the Child.

vi. It is Dr. Hamati's office policy that if appointments are missed, it is the responsibility of the patient's parent to reschedule the appointment so that the Child receives proper medical supervision by Dr. Hamati.

vii. As of 2015, an EEG indicated that the Child is still at high risk for seizures. If his seizures go untreated the Child could suffer permanent brain damage.

viii. The Child requires catheterization five (5) to six (6) times per day. Failure to regularly catheterize the Child will result in kidney infections. If [J.J.] suffers frequent infections, he could develop resistance to antibiotics.

ix. While the Child's medical conditions are extremely serious, the Child is likely to live well into adulthood if he receives appropriate care.

x. The Child has cognitive impairments that make it difficult for him to manage his own care. Substantial assistance from an adult caregiver is necessary to ensure the Child receives adequate care.

xi. The Child has been adjudicated a Child in Need of Services on three (3) separate occasions.

xii. The Child was first adjudicated a Child in Need of Services under Cause No. 28C01-1109-JC-032. The Family worked with [Family Case Manager ("FCM")] Karen Roach of the Greene County DCS under this Cause.

xiii. During CHINS Cause No. 28C01-1109-JC-032, Respondent Parents admitted to domestic violence. Respondent Parents also admitted that alcohol consumption contributed to the altercation that resulted in the initiation of the CHINS matter. DCS worked

with the family in addressing [J.J.]'s medical/hygiene needs during this CHINS matter. FCM Karen Roach worked with the family under this cause starting in late 2011 and continued through December of 2012.

xiv. During her initial work with the family, FCM Roach found the home to have conditions to be unsafe for [J.J.] with trash and debris on the floor. This was particularly problematic for [J.J.], as the trash and debris throughout the home impaired his mobility when using a wheelchair and made it unsafe for him to crawl on the floor, which was an alternative method of mobility for [J.J.] at the time.

xv. During the Court's exercise of jurisdiction in Cause No. 28C01-1109-JC-032, two Homebuilders referrals were provided. Homebuilders is an intensive in-home services program. The parents did not make substantial progress with the first referral and a second referral was required.

xvi. [J.J.] was removed from his Parents' care in March of 2012 and placed in a foster home. Kenneth Branaman was the Child's foster father at this time and Mr. Branaman and his wife provided foster care for the Child until July of 2012. In October of 2012, the Child was returned to Mr. Branaman's care for a matter of days and was subsequently returned to the Respondent Parents' care.

xvii. During FCM Roach's work with the family, the Family received a Habitat for Humanity home built with specifications to meet [J.J.]'s medical needs. Respondent Parents did not maintain payments on the home and the family was required to vacate the home.

xviii. Jurisdiction in Cause No. 28C01-1109-JC-032 was terminated in December of 2012.

xix. The Child was adjudicated a Child in Need of Services for a second time under Cause No. 60C01-1311-JC-152. Under this Cause the Child was found to be a Child in Need of Services under I.C. [§] 31-34-1-1. The Court specifically found, inter alia, in its Fact-Finding Order entered on November 25, 2013, that:

> "On or around November 6, 2013, [Father and Mother] were involved in a domestic violence incident that resulted in injuries to both parties. The children were present in the home during the fight. [Someone] attempted to intervene in the fight and was thrown down. Both parents admit there was a fight and they sustained injuries. Both parents admit they were drinking alcohol prior to the fight. Both parents admit there have been previous incidents of domestic violence.

> FCM Charlotte Church interviewed [Mother] on November 6, 2013. [Mother] made statements indicating suicidal ideations, such as she doesn't want to live any longer and she wants to die every day. [Mother] stated that she has been diagnosed with borderline personality disorder, depression, and anxiety, but she is not currently receiving services or medication because of a lapse in her insurance. [Mother] had attempted suicide earlier this year."

xx. The Family worked with ongoing FCM Shea Finnegan under Cause No. 60C02-1311-JC-152.

xxi. During the Court's exercise of jurisdiction in Cause No. 60C02-1311-JC-152, it was identified that [J.J.] would need to wear a CPAP machine at night due to his sleep apnea. Respondent Father was unable or unwilling to ensure that Child utilized the CPAP as directed, in spite of the fact that there were concerns that the sleep apnea was affecting the Child's heart function.

xxii. Jurisdiction was terminated in Cause No. 60C02-1311-JC-152 on September 26, 2014.

xxiii. The Child was adjudicated a Child in Need of Services for a third time under Cause No. 60C01-1411-JC-255 (referred to hereinafter as "the underlying CHINS Cause"). The underlying CHINS Cause was initiated in Owen Circuit Court I and was subsequently transferred to Owen Circuit Court II by operation of local rule. It was then assigned Cause No. 60C02-1411-JC-255.

xxiv. The Child was removed from the home in the underlying CHINS Cause under a Court Order entered on November 24, 2014.

xxv. In the underlying CHINS Cause, the Child was again placed in foster care with Mr. and Mrs. Branaman. At the time Child was placed in the Branaman's care, no medication or medical equipment was provided by Respondent Parents.

xxvi. Because Mr. Branaman had previously provided foster care for [J.J.], he became concerned when no seizure medication was provided and took steps to ensure [J.J.] would receive his seizure medication. Respondent Parents did not contact the Branamans regarding [J.J.]'s medications or medical equipment during [J.J.]'s transition to the Branaman's home.

xxvii. After being assigned to the matter, FCM Webb asked Respondent Father why [J.J.] was out of medication at the outset of the underlying CHINS Cause. When asked, Respondent Father blamed Respondent Mother. Respondent Father reported that Respondent Mother was receiving the appointment reminders and not communicating that information. Regardless of the reasons, Respondent Parents failed to ensure the Child continued to receive his medically necessary seizure medication.

xxviii. In Cause Number 60C02-1411-JC-255, Respondent Parents admitted the Child was a Child in Need of Services under I.C. [§] 31-34-1-1 and the Court specifically found, inter alia, that: "Respondent Father physically assaulted [two of J.J.'s siblings] while intoxicated; Home conditions—no running water—are not appriate [sic] for the Children. Assault took place in front of [J.J.], who became scared and upset."

xxix. On January 29, 2015, the Court entered its Dispositional Decree in Cause No. 60C02-1411-JC-255. The Order adopted the recommendations contained in the Predispositional Report as the Court's Order and Ordered, inter alia, that:

"W. CHILD MEDICAL/MENTAL NEEDS: [Father and Mother] will meet all of the medical and mental health needs of the children in a timely and complete manner. This includes[,] but is not limited to, following all directions of nurses/doctors, attending all appointments scheduled[,] and giving all medications as prescribed for the above[-]named children in the prescribed doses at the prescribed times.

J. SUITABLE HOUSING: [Father and Mother] will maintain suitable, safe, stable housing with adequate bedding, functional utilities, adequate supplies of food[,] and food preparation facilities. [Father and Mother] will keep the family residence in a manner that [is] structurally sound, sanitary, clean, free from clutter[,] and safe for the Children.

A. [sic] CONTACT THE CASEMANAGER: [Father and Mother] will contact the Family Case Manager every week to allow the Family Case Manager to Monitor Compliance with the Child in Need of Services matter. The contact may be in person, by letter, e-mail or by telephone."

xxx. The Court additionally Ordered [Mother], inter alia, to secure housing to accommodate herself, [N.J.] and [J.J.] within six (6) months.

xxxi. In August of 2015, the Child had an overnight visit with Respondent Father. During this visit, FCM Webb stopped in to see the Child. When asked by FCM Webb, Respondent Father did not appear to understand the dose meter on the Child's albuterol inhaler. Respondent Father also planned to give the Child Rectal Diastat, which he showed to FCM Webb. The Rectal Diastat had expired in 2011.

xxxii. During the fall of 2015, the Child had multiple urinary tract infections and there were concerns that Respondent Father did not have an adequate understanding regarding how much water [J.J.] needed to have administered.

xxxiii. In November of 2015, the Child had dental surgery due to substantial tooth decay. Respondent Parents were not present for the surgery and did not visit the Child in the hospital.

xxxiv. In December of 2015, Respondent Parents attended a medical appointment regarding [J.J.]'s use of the CPAP machine. During this appointment, when [J.J.] became upset about using the equipment, [Father] held the Child like an infant and told him that he did not have to wear the CPAP machine.

xxxv. On numerous occasions during supervised visits in the underlying CHINS Cause, the Child's medical needs were not met by Respondent Parents.

xxxvi. After a visit with Respondent Mother the Child's G-Tube became dislodged. The dislodged G-Tube was discovered by the Child's Placement.

xxxvii. During a visit with Respondent Mother, the Child was allowed by Mother to ingest cake batter in spite of his medical restrictions and aspiration concerns.

xxviii. On numerous occasions during her visits, Respondent Mother failed to provide the Child with water pursuant to his medical schedule.

xxxix. On numerous occasions after visiting with Respondent Parents, [J.J.]'s g-tube site was extremely dirty, evidencing both Parents' inability to monitor the Child's ongoing medical and hygiene needs, even for short periods.

xl. During a visit with Respondent Mother, visit supervisor Dorothy Oliver observed Respondent Mother smoking in the house. Ms. Oliver also observed the Child fall off the couch during a visit with Mother. The Child was observed to lie on the floor for several minute[s] before Mother's roommate lifted him back on to the couch. Mother has numerous pets in the home. Respondent Mother's home smells like cat urine and the odor has persisted after she attempted to clean her carpet with a rug doctor. Cat feces have also been observed in the home. Under the circumstances, the Child being allowed to lie on the floor after falling off of the couch reaffirms concerns that his health and hygiene are not treated with the urgency necessary to ensure his wellbeing.

xli. During a visit in September of 2016, Respondent Mother left necessary medical equipment at home, including a g-tube extension and feeding syringe.

xlii. During the underlying CHINS cause, Respondent Father was not able to supply the Child with CPAP equipment due to owing the medical equipment supplier monies and not making any alternative arrangements. As of the Fact-Finding Hearing in the above-captioned cause, there is no indication this situation has been remedied.

xliii. After the concerns regarding [J.J.] having infections were identified in the fall of 2015, issues regarding the same persisted. The Child would return from visits with Respondent Parents suffering from urinary tract infections. The same was noted in the Court's order entered on May 12, 2016.

xliv. The CASA made limited observations [of] the Child at the homes of each Respondent Parent. CASA Volunteer Patricia Hill expressed concerns regarding the cleanliness of both homes and that each parent treats [J.J.] in an age/developmentally inappropriate manner. The CASA also expressed concerns that each Respondent Parent fails to understand the urgency of the Child's medical needs.

xlv. Respondent Mother does not have reliable personal transportation available.

xlvi. In the summer of 2016, Respondent Father's home-based visitations were discontinued due [to] concerns of the visit supervisor regarding a possible bed bug infestation. Respondent Father was allowed to continue community-based supervised visits for a time. Eventually community-based visits were put on hold in November of 2016 due to inconsistent participation by Respondent Father. It was not until December 2, 2016, that Respondent Father provided confirmation from an extermination service . . . indicating that there [were] no signs of live bugs or current bed bug activity.

xlvii. Respondent Father blamed the Child's older siblings for the most recent CHINS matter being opened. Respondent Father has failed to maintain contact with FCM Webb.

xlviii. Since being removed from Respondent Parents' care, [J.J.] has gotten in full compliance with his CPAP regimen. In the care of Respondent Parents, he was not fully compliant. Respondent Parents failed to notify DCS at the outset of the underlying CHINS Cause that the Child needed to utilize a

CPAP machine and the Child was not provided with the machine at his first placement.

xlix. In the underlying CHINS Cause, DCS has provided services to Respondent Parents to assist them in understanding and meeting [J.J.]'s extensive medical needs. Respondent Parents were strongly encouraged to attend and participate in [J.J.]'s medical appointments to assist them in better understanding his ongoing medical needs.

l. The Child's placement Emily Brown has been extremely diligent in attempting to assist Respondent Parents in understanding and meeting the Child's medical needs.

li. Respondent Parents have a strained relationship with Ms. Brown and have failed to regularly communicate with her in spite of the fact that this communication would likely assist them in better understanding the Child's current medical regimen.

lii. Respondent Parents were directed to maintain medical notes regarding [J.J.]'s care to assist them in staying up-to-date on the Child's medical needs.

liii. On different occasions during the case, the Parents have been unable to answer questions regarding the Child's medical regimen. At times, and despite substantial support from DCS and service providers, Respondent Parents have not . . . maintained the most up-to-date information regarding the Child's care.

liv. At times during [J.J.]'s medical appointments, Respondent Parents have been unable to complete required paperwork, unable to list the Child's medications, and have not always brought along resources (notebooks, medical binders, etc.) that would assist them in providing necessary information to [J.J.]'s providers.

lv. During the underlying CHINS Cause, [J.J.] has had somewhere between fifty (50) and sixty (60) medical appointments. Respondent Parents each attended approximately eleven (11) of [J.J.]'s appointments.

lvi. In August of 2016, the Child had to have an emergency revision of the shunt in his brain. During his related hospital stay, neither Respondent Parent came to visit the Child.

lvii. At times, Respondent Father engaged [in] conversation with the Child during visits that caused the Child to become very distraught.

lviii. The Child has struggled with emotional outbursts, aggressive behaviors, and self-injurious behaviors for a substantial period of time. In September and October of 2016 the Child exhibited significant improvement in these areas. There was also significant improvement in the Child's behaviors after Respondent Parents' visits returned to fully supervised.

lix. Respondent Parents love and care about the Child, but Respondent Parents lack the ability to meet the Child's day-to-day medical needs. Respondent Parents will be extremely unlikely to adequately address the Child's additional needs after spinal surgery.

lx. After over two years of out-of-home placement, the Child has not been returned to the care of either Respondent Parent. At present, the Child's safety cannot be ensured in the care of either Parent and the Child needs permanent, adequate care and supervision.

a. [sic] Termination of the Parent-Child relationship is in the best interest of the Child, to wit:

i. Respondent Parents have been unable to provide for the Child's care, without State intervention, for a substantial portion of the Child's life.

ii. Respondent Parents have exhibited a longstanding pattern of inability to meet the Child's needs for care and supervision.

iii. The Child's older sibling, [N.J.], resides with the Child in his current placement. The Child has a very positive relationship with [N.J.] and his other adult siblings. This relationship is likely to be maintained and supported in the Child's current placement.

iv. The Child needs and deserves permanency. The Child should not be required to continue to wait for permanency.

b. There is a satisfactory plan for the care and treatment of the Child, which is:

Adoption by current placement Emily Brown. Ms. Brown has provided exceptional care for the Child for a substantial period of time and is prepared to continue to provide this level of care as an adoptive parent to the Child.

Base on the foregoing, it is ORDERED, ADJUDGED, and DECREED that the Parent-Child Relationship between [J.J.], the Child, and [Father and Mother] be terminated, and all rights, powers, privileges, immunities, duties, and obligations pertaining to that relationship are hereby permanently terminated.

Appellants' App. at 96-104. This appeal ensued.

# Discussion and Decision

We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

* * *

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[6] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[7] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and,

second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[8] On appeal, Parents contend that the trial court erred when it concluded both that the conditions that resulted in Child's removal and the reasons for his placement outside of Parents' homes will not be remedied and that termination is in Child's best interest. We address each contention in turn.[1]

### *Conditions that Resulted in Child's Removal will not be Remedied*

[9] In determining whether the evidence supports the trial court's finding that Parents were unlikely to remedy the reasons for Child's removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's

---

[1] The trial court did not conclude that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the child.

habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

[10] Father does not challenge the trial court's findings on this issue, and we cannot say that the trial court clearly erred when it concluded from those findings that the conditions that resulted in Child's removal will not be remedied. Child was removed from Parents' care due to Parents' substance abuse, inappropriate discipline, physical aggression against Child's siblings, emotional neglect, and unhealthy living conditions. While Father has complied with substance abuse counseling and random testing and has shown success in that treatment, Father did not successfully complete health coaching, which was designed to educate Father on Child's medical needs, including caring for Child's feeding tube. Father has missed the majority of Child's doctor's appointments during the CHINS proceedings, and his visitation with Child has been inconsistent. Father's last visit with Child was October 30, 2016.

[11] Mother "takes issue" with five of the trial court's findings. Mother's Br. at 11. In particular, Mother asserts that the challenged findings are "too general" or do not "tell the complete story" such that they do not support termination. *Id.*

at 11-12. However, Mother does not challenge the record on which those findings are based, and our review of the record supports the challenged findings. In all, Mother merely attempts to explain the circumstances surrounding: her failure to meet Child's medical needs; the time she fed cake batter to Child; the three times Mother did not give Child water as directed; whether her house smelled of cat urine after she had cleaned the rug; and the "one occurrence" of cat feces observed outside of a litter box. Mother's Br. at 13.

[12] Parents' arguments on appeal simply seek to have this court disregard the evidence most favorable to the trial court's judgment and instead reweigh the evidence in their favor. We will not do so. The evidence supports the trial court's findings that neither Father nor Mother has demonstrated the ability to properly care for Child's special medical needs. And Parents have not been diligent in participating in Child's medical appointments. We cannot say that the trial court clearly erred when it concluded that the conditions that resulted in Child's removal will not be remedied.

### Best Interests

[13] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best

interests." *Castro v. State Ofc. of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

[14] Parents do not challenge the trial court's findings in support of this conclusion. Indeed, Mother concedes that the trial court "may have an argument that the Minor Child should not live with either parent[;] however, Father's brief makes a good argument that he is capable of providing the care if he had assistance." Mother's Br. at 15. Mother then asserts, without any support in the record, that she "too believes that she could provide the Minor Child a home if she had assistance." *Id.* Regardless, Parents' contentions on this issue amount to nothing more than a request that we reweigh the evidence, which we will not do.

[15] DCS presented evidence that, since the fall of 2016, Parents have failed to attend the majority of Child's medical appointments. Neither did Parents visit Child when he was hospitalized in August 2016. Parents have consistently demonstrated that they are not fully committed to providing the necessary care for Child, who has multiple and complex medical needs. Child needs consistent and reliable care, and he needs permanency. The totality of the evidence, including Parents' historical inability to provide a safe and stable home and their refusal to take advantage of the resources DCS provided them, supports the trial court's conclusion that termination of Parents' parental rights is in Child's best interest.

Affirmed.

Kirsch, J., and Brown, J., concur.